**RECORD NO. 13-2492**

In the
# United States Court of Appeals
*for the*
# Fourth Circuit

**ERNIE S. BALDWIN,**

*Plaintiff-Appellant,*

v.

**DUKE ENERGY CORPORATION and DUKE ENERGY BUSINESS SERVICES LLC,**

*Defendants-Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA, CHARLOTTE DIVISION**

# BRIEF OF APPELLEES

STEPHEN D. DELLINGER, ESQ.
*sdellinger@littler.com*
MOLLY M. SHAH, ESQ.
*mmshah@littler.com*
**LITTLER MENDELSON, P.C.**
**100 North Tryon Street, Suite 4150**
**Charlotte, North Carolina 28202**
**704.972.7000 (telephone)**
**704.333.4005 (facsimile)**
*Counsel for Defendants-Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __13-2492__        Caption: __ERNIE S. BALDWIN  v. DUKE ENERGY CORPORATION et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__DUKE ENERGY CORPORATION__
(name of party/amicus)

_____

 who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☑ YES ☐ NO

2.      Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐ YES ☑ NO
        If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Stephen D. Dellinger                    Date:    12/26/2013

Counsel for: Appellee

# CERTIFICATE OF SERVICE
**************************

I certify that on _____12/27/2013_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Kenneth Love
Love & Dillenbeck Law, PLLC
3410 Healy Drive
Suite 208
Winston Salem, NC 27103
kennethl@ldlawnc.com

s/ Stephen D. Dellinger                              12/27/2013
       (signature)                                      (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __13-2492__       Caption: __ERNIE S. BALDWIN  v. DUKE ENERGY CORPORATION et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__DUKE ENERGY BUSINESS SERVICES LLC__
(name of party/amicus)

_____

 who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                ☑ YES ☐ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
         Duke Energy Business Services LLC is a wholly owned subsidiary of Duke Energy Corporation.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                ☐ YES ☑ NO
        If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: __s/ Stephen D. Dellinger_____      Date: ____12/26/2013____

Counsel for: __Appellee_____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____12/27/2013_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Kenneth Love
Love & Dillenbeck Law, PLLC
3410 Healy Drive
Suite 208
Winston Salem, NC 27103
kennethl@ldlawnc.com

__s/ Stephen D. Dellinger_____      _____12/27/2013_____
(signature)      (date)

TABLE OF CONTENTS

PAGE

I.   STATEMENT OF THE CASE .................................................................1

II.  STATEMENT OF FACTS ....................................................................3

     A.   Baldwin's Performance Issues Long Predated His Termination
          And Also Predated His Supervisors' Knowledge Of Any
          Protected Category Allegedly Applying To Him ...............................3

          1.   Baldwin Had Recurring Performance Issues Prior To
               Transferring To Nuclear It, Which Persisted In His New
               Role ...........................................................................................4

          2.   Rozzelle Supports Baldwin By Attending A Volunteer
               Event He Organized On May 29, 2009....................................6

          3.   Baldwin's Performance Problems Arose And Continued
               Before He Requested FMLA Leave ..........................................7

          4.   Baldwin Receives An Overall Rating Of "Partially
               Meets" Expectations On His 2009-2010 APA, Which
               Mirrored Rozzelle's Prior Concerns And The Concerns
               Expressed By Previous Supervisors On Earlier APAs ..............8

     B.   Baldwin's FMLA Leaves Of Absence Begin Long After His
          Performance Problems Began And Ended Long Before He Is
          Discharged ...........................................................................................9

          1.   Baldwin's November 2009 Leave Of Absence Was For
               A "Minor" Outpatient Procedure, And Baldwin Admitted
               He Does Not Believe Anything Actionable Occurred
               Because Of It..............................................................................9

          2.   Baldwin Told Duke That His Second Leave Of Absence
               On January 19, 2010 Was For A Non-Cancer Abdominal
               Surgery, And Duke Subsequently Allowed Him To Work
               From Home Due To A Temporary, Unspecified
               Restriction ...............................................................................10

     C.   Duke Assists With Baldwin's Temporary Medical Restriction,
          But He Refuses To Return To The Office To Work And Is
          Discharged Accordingly..................................................................13

i.

D.     Duke's Investigation Of Baldwin's May 13, 2010 Complaint Of Religious Discrimination Did Not Corroborate His Concerns ..........16

E.     The Bulk Of Baldwin's "Evidence" Comprises Inadmissible And Disproven Allegations ....................................................18

III.     SUMMARY OF ARGUMENT ..................................................19

IV.     ARGUMENT ..............................................................................22

A.     Standard Of Review ......................................................22

B.     The District Court Properly Granted Summary Judgment In Favor Of Duke ..............................................................24

     1.     The Only Actionable Adverse Action At Issue Is Baldwin's Termination ............................................24

     2.     There Is No Evidence To Support The Contention That Baldwin's FMLA Leave Resulted In His Termination ..........27

     3.     The District Court Correctly Concluded That There Was No Evidence That Duke Unlawfully Discriminated Against Baldwin Based On A Perceived Disability. ..............36

     4.     Baldwin Has Adduced No Evidence To Support His Claim That Duke Took An Adverse Employment Action Against Him Because Of His Religion ....................41

V.     CONCLUSION............................................................................42

VI.     REQUEST FOR ORAL ARGUMENT ......................................43

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Arms Int'l v. Herbert*,
563 F.3d 78 (4th Cir. 2009) ................................................................39

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........................................................................23

*Averette v. Diasorin, Inc.*,
No. 3:11CV203, 2011 U.S. Dist. LEXIS 93761 (W.D.N.C. Aug. 22,
2011) ................................................................................................29

*Baber v. Hospital Corp. of Am.*,
977 F.2d 872 (4th Cir. 1992) ............................................................23

*Baldwin v. Blue Cross/Blue Shield of Ala.*,
480 F.3d 1287 (11th Cir. 2007) ........................................................34

*Berry v. T-Mobile USA, Inc.*,
490 F.3d 1211 (10th Cir. 2007) ........................................................37

*Canady v. Crestar Mortg. Corp.*,
109 F.3d 969 (4th Cir. 1997) ............................................................21

*Corrigan v. Perry*,
1998 U.S. App. LEXIS 5859 (4th Cir. Mar. 24, 1998) .....................33

*De Leon v. St. Joseph Hosp., Inc.*,
871 F.2d 1229 (4th Cir. 1989) ..........................................................24

*Dollar v. Smithway Motor Xpress, Inc.*,
710 F.3d 798 (8th Cir. 2013) ............................................................35

*Dulaney v. Packaging Corp. of Am.*,
673 F.3d 323 (4th Cir. 2012) ............................................................26

*Edmondson v. Am. Motorcycle Ass'n, Inc.*,
7 F. App'x 136 (4th Cir. 2001).................................................20, 25

*Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*,
    53 F.3d 55 (4th Cir. 1995) ...................................................................32

*Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*,
    507 F.3d 1306 (11th Cir. 2007) .........................................................37

*Gross v. FBL Fin. Servs., Inc.*,
    557 U.S. 167 (2009). Application of the .........................................29

*Hollestelle v. Metropolitan Wash. Airports Auth.*,
    1998 U.S. App. LEXIS 9420 (4th Cir. May 8, 1998).........................33

*King v. Rumsfeld*,
    328 F.3d 145 (4th Cir. 2003) ..............................................................30

*Laing v. Fed. Express Corp.*,
    703 F.3d 713 (4th Cir. 2013) ........................................................28, 36

*Lee v. State Bd. for Community Colls.*,
    1995 U.S. App. LEXIS 20658 (4th Cir. Aug. 4, 1995).....................26

*Maynard v. Gen'l Elec. Co.*,
    486 F.2d 538 (4th Cir. 1973) ........................................................22, 40

*Mercer v. Arc of Prince Georges County, Inc.*,
    532 F. App'x 392 (4th Cir. 2013)..................................................30, 32

*Othentec Ltd. v. Phelan*,
    526 F.3d 135 (4th Cir. 2008) ..............................................................39

*Pollard v. High's of Balt., Inc.*,
    281 F.3d 462 (4th Cir. 2002) ..............................................................40

*Price Waterhouse v. Hopkins*,
    490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) ................29

*Reynolds v. Am. Nat'l Red Cross*,
    701 F.3d 143 (4th Cir. 2012) ....................................................22, 41, 42

*Rhoads v. FDIC*,
    257 F.3d 373 (4th Cir. 2001) ..............................................................37

*Rinehimer v. Cemcolift, Inc.*,
  292 F.3d 375 (3d Cir. 2002) ...............................................................35

*Shealy v. Winston,*
  929 F.2d 1009 (4th Cir. 1991) ...........................................................23

*Smith v. Ashland, Inc.*,
  250 F.3d 1167 (8th Cir. 2001) ...........................................................31

*Smith v. Flax,*
  618 F.2d 1062 (4th Cir. 1980) ...........................................................32

*United States v. Jones,*
  496 F. App'x 312 (4th Cir. 2012) ......................................................25

*United States v. Palacios,*
  677 F.3d 234 (4th Cir. 2012), *cert. denied*, 133 S. Ct. 124, 184 L. Ed. 2d
  59 (Oct. 1, 2012) .................................................................................1

*United States v. Taylor,*
  659 F.3d 339 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 1817, 182 L. Ed. 2d
  634 (2012) ...........................................................................................25

*Univ. Texas Sw. Med. Ctr. v. Nassar,*
  133 S. Ct. 2517 (2013)................................................21, 27, 28, 29

*Wells v. Gates,*
  336 F. App'x 378 (4th Cir. 2009) ......................................................26

*Wulff v. Sentara Healthcare, Inc.*,
  2013 U.S. App. LEXIS 4446 (4th Cir. 2013) ....................................40

*Young v. UPS,*
  707 F.3d 437 (4th Cir. 2013) .............................................................38

## S<span style="font-variant:small-caps">TATUTES</span>

42 U.S.C. § 2000e-2(m).........................................................................29

42 U.S.C.S. § 12201(h)...........................................................................40

ADA .............................................................................................passim

Americans with Disabilities Act ...................................................................1

Americans with Disabilities Act, the FMLA ........................................35

FMLA ...............................................................................................passim

section, 42 U.S.C. § 2000e-3(a) .............................................................28

Title VII of the Civil Rights Act of 1964.................................1, 21, 28, 29

## <u>O</u>THER <u>A</u>UTHORITIES

29 C.F.R. § 825.216(c) ............................................................................35

29 C.F.R. § 825.220(c) ............................................................................29

Baldwin's "Statement of Case" ...............................................................1

Fed. R. App. P. 28(a)(9)(A) .....................................................................1

Fed. R. Civ. P. 56(c) ...............................................................................23

## I.    STATEMENT OF THE CASE[1]

This case comes down to the sole issue of whether or not Appellees Duke Energy Corporation and Duke Energy Business Services, LLC (collectively "Duke") wrongfully discharged Appellant Ernie S. Baldwin ("Baldwin"). Baldwin's counsel admitted this point to the District Court, (JA-1768-69), but now impermissibly attempts to retract it and expand his claims.

Baldwin claims that Duke terminated him because:  (1) he is allegedly Jewish, in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"); (2) it perceived him as disabled, in violation of the Americans with Disabilities Act, as amended ("ADA" or "ADAAA"); (3) he took Family Medical Leave Act ("FMLA") leaves; and (4) he filed an internal complaint about his former direct supervisor, in violation of Title VII's anti-retaliation provision.[2]  (JA-32-62.)  Importantly, and contrary to the implications in Baldwin's Opening Brief, Baldwin **never** alleged that he is disabled within the scope of, or that he sought or was entitled to a reasonable accommodation under, the ADAAA.  (*See id.*)

---

[1] Duke includes this section to supplement the "Statement of Case" included in Baldwin's opening brief.  Duke does not otherwise disagree with Baldwin's "Statement of Case" as stated.  (Baldwin's Opening Br. p. 5.)

[2] Though Baldwin's Amended Complaint included a claim for retaliation under the ADAAA, he made no mention of such a claim in his Opening Brief, thus waiving his appeal of that claim.  *See United States v. Palacios*, 677 F.3d 234, 244 n.5 (4th Cir. 2012) (an appellant waives a particular argument by not raising it in his opening brief), *cert. denied*, 133 S. Ct. 124, 184 L. Ed. 2d 59, (Oct. 1, 2012) (No. 11-10137); *see also* Fed. R. App. P. 28(a)(9)(A).

Duke moved for summary judgment as to all claims on September 13, 2013, and summary judgment briefing continued through Duke's filing of a Reply on October 28, 2013. (JA-1412-36.) The District Court held oral arguments on November 6, 2013. During those arguments and upon being directly challenged with the evidentiary record, Baldwin's counsel made critical concessions demonstrating the absence of discrimination or retaliation. The summary judgment briefings, record evidence, and noted concessions supported the District Court's entry of summary judgment against Baldwin.

First, Duke demonstrated – and Baldwin conceded during oral argument – that the only legally actionable adverse employment action was his termination. (JA-233, 235-38, 1417-18, 1768-69.) Second, Duke established that the sole alleged "bad actor," Barbara Rozzelle, played no role in his termination, nor was his performance a factor in the termination decision. (JA-223-24, 1027; *see also* JA-1430-31.) Third, even if Baldwin's performance was somehow at issue, Duke established that Baldwin's documented performance problems began far before the alleged basis of his claims arose. (JA-212-16, 232, 241, 245, 1422-27.) Finally, Duke showed there was no record evidence that the decision-makers regarded Baldwin as disabled, or that his alleged Judaism, FMLA leaves or internal complaints played any role in the termination decision. (*See generally* JA-209-49, 1425-26, 1412-34.) Instead, it was uncontroverted that Duke terminated Baldwin's

2

employment after he repeatedly ignored its instruction to return to the office to work. (*Id.*) Indeed, Baldwin proffered insufficient evidence to support even a *prima facie* case for each of his claims, because it amounted to nothing more than speculation, conjecture, or the perceptions of non-decision-makers not in a position to know all the relevant circumstances.

Agreeing there were no *genuine* issues of *material* fact, the District Court issued an Order granting summary judgment as to all of Baldwin's claims. (JA-1721-39.) Baldwin now appeals the District Court's Order. (Baldwin Opening Br.)

## II.    STATEMENT OF FACTS

### A.    Baldwin's Performance Issues Long Predated His Termination And Also Predated His Supervisors' Knowledge Of Any Protected Category Allegedly Applying To Him.

Duke hired Baldwin in 2005 as a Senior Application Analyst in its Power Delivery Information Technology department ("Power Delivery IT"). (JA-211 (citing JA-262, 290-91).) In March 2009, Baldwin transferred to the Nuclear Energy, Safety and Protection Applications department ("Nuclear IT"). (JA-211 (citing JA-312-13).) There, he held the same position and came under the supervision of a newly-appointed IT Manager, Barbara Rozzelle. (JAA-211 (citing JA-755, 761); JA-982.) Baldwin remained in this position until he was discharged

3

on August 16, 2010 following his repeated refusal to report to the office to work.
(JA-211 (citing JA-748-49).)

### 1. Baldwin Had Recurring Performance Issues Prior To Transferring To Nuclear IT, Which Persisted In His New Role.

Prior to joining Nuclear IT, various supervisors in Power Delivery IT noted recurring deficiencies with Baldwin's performance that were similar to the issues later reported by Rozzelle. (JA 212 (citing JA-498-505, 508-10).) These recurring deficiencies were set forth in Baldwin's annual performance appraisals ("APA") and included problems with his communicating effectively with his supervisors and co-workers, informing others of his schedule and availability, time management, prioritization of tasks, and managing work. (JA-212 (citing JA-292-310).) Notably, all of these documented performance deficiencies occurred **before the complained-of actions in this lawsuit**. (JA-212 (citing JA-292-310, 498-505, 508-10).)

Almost immediately upon Baldwin's transfer to Nuclear IT, Rozzelle became concerned about certain aspects of his performance and had difficulty monitoring his time. (JA-213 (citing JA-773-75, 986-90).) These concerns included Baldwin's inability to work regularly-scheduled hours, to communicate effectively and in a timely manner with her regarding his status on work projects and availability, and to focus on and commit to performing his assigned work.

(*See id.*)   Rozzelle also questioned her initial decision to approve Baldwin's participation in Duke's Work @ Home program.  (JA-213 (citing JA-693, 785, 986-87, 1031-36).)[3]

As early as mid-May 2009, Rozzelle consulted with her then-supervisor for guidance about how best to address Baldwin's performance-related deficiencies. (JA-213 (citing JA-989, 1031-36).)  They decided that Rozzelle would meet with Baldwin to identify her concerns and set expectations.  (*See id.*)  Moving forward, Rozzelle would require Baldwin to provide weekly status updates.   (*Id.*) Additionally, Baldwin would no longer participate in Duke's Work @ Home program;  instead, he would report to the office allowing for greater direct supervision.  (*Id.*)

To that end, on May 14, 2009, Rozzelle personally met with Baldwin and provided him with her assessment, which included, among other concerns, his having problems focusing and performing his work assignments, adhering to a regular schedule, and communicating his availability.  (JA-213-14 (citing JA-513-16, 316-19, 784, 789, 802-03, 989-92, 1029-30)).)   Rozzelle also instructed Baldwin to provide her with weekly status updates and to immediately return to the office to work, and she informed Baldwin that she expected improvement in the

─────────────────────

[3]Under this program, Baldwin was afforded the privilege of working from his residence during regularly-scheduled work hours. (JA-213 (citing JA-986, 785, 866, 877-82, 375).) Rozzelle had the absolute discretion to grant, revoke, or suspend Baldwin's participation in the Work @ Home program. (*Id.*)

areas identified.  (*Id.*)  On May 15, and again on June 2, 2009, Rozzelle emailed Baldwin confirming the substance of their May 14 meeting.  (JA-214 (citing JA-513-16).)

### 2.    Rozzelle Supports Baldwin By Attending A Volunteer Event He Organized On May 29, 2009.

On May 29, 2009, Baldwin and Rozzelle attended a Duke-sponsored volunteer event held at and benefiting a Legal Aid office.  (JA-224 (citing JA-517-19, 324-25, 765-69).)  Baldwin claims that Rozzelle learned he is Jewish at this event when someone told a "joke," albeit one that did not reference him. Baldwin's allegation is completely unsupported by the record evidence and is based entirely on several layers of conjecture.  (JA-230-32 (citing JA-328-33, 684-87, 690, 769-72, 991, 1025).)  First, Rozzelle did not hear any alleged "joke" about Jewish people at this event, nor did she otherwise hear anyone imply that Baldwin is Jewish.  (JA-230 (citing JA-769-72, 991, 1025).)  Baldwin has not disputed these facts,[4] nor did he proffer the alleged "joke" teller or anyone at the event who heard such an alleged "joke."  (JA-328-33.)  Rozzelle did not learn that Baldwin

---

[4] Contrary to his Opening Brief, Baldwin's deposition admission that Rozzelle expressed no reaction to the alleged "joke" is entirely consistent with Rozzelle's testimony that she never heard a "joke" about Jewish people at the event.  (JA-991, 1025.)

considers himself Jewish until June 2010 at the earliest. (JA-991, 1025.) In fact, Baldwin and Rozzelle never discussed Baldwin's religion.[5] (JA-330-33.)

### 3. Baldwin's Performance Problems Arose And Continued Before He Requested FMLA Leave.

Despite Rozzelle's communications with Baldwin about his performance and attendance issues, these issues persisted. For example, in June 2009, Baldwin ignored Rozzelle's express direction to work at the office and instead worked from home on several days without informing her until she so inquired. (JA-214 (citing JA-590-91, 776-77, 992-93, 1041-51).) When Rozzelle discovered this, and because of other continuing concerns she had regarding Baldwin's performance, she reiterated her expectations by presenting Baldwin with a "Working Expectations" list. (JA-214 (citing JA-992-94, 1058-59).)

Shortly thereafter, Rozzelle issued Baldwin an "interim" performance appraisal. (JA-1003-04.) In preparing it, Rozzelle opted to give Baldwin some benefit of the doubt following his assurances that he would perform according to the "Working Expectations" memorandum. (*Id.*) To that end, the "interim" appraisal included both positive and negative feedback. (*Id.*)

---

[5] Baldwin has not presented any evidence to establish that he is actually Jewish and, instead, relied on his mere allegation about his religious faith. Duke, however, presented voluminous evidence disputing Baldwin's allegation of his Jewish faith. (JA-227-29 (citing JA-423-32, 460, 631-32, 676-88, 690, 728-35, 1150-60); JA-1418-22.) This evidence included church records demonstrating that Baldwin was baptized, as well as his admission to his counselor that he is Baptist. (*See id.*)

Baldwin did not honor his assurances that he would improve his performance. Instead, he repeatedly failed to follow various protocols and other directives Rozzelle provided to him. (JA-215-16 (citing JA-301, 781-83, 983-85, 994-98, 1063-77).) As a result, Rozzelle was more critical in Baldwin's formal APA. (JA-1003-04.)

### 4. Baldwin Receives An Overall Rating Of "Partially Meets" Expectations On His 2009-2010 APA, Which Mirrored Rozzelle's Prior Concerns And The Concerns Expressed By Previous Supervisors On Earlier APAs.

Rozzelle began preparing Baldwin's APA in October 2009. (JA-216 (citing JA-1004-05).) As part of the process, Rozzelle solicited feedback from Baldwin and his peers, though Baldwin provided no such feedback before his APA was finalized. (JA-216 (citing JA-798-801, 983, 1005, 309).) Rozzelle incorporated **all** of Baldwin's peers' positive and negative feedback in his APA and reiterated her previously-stated concerns, as well. (JA-216-17 (citing JA-1005, 1095-96, 716, 529-31, 335-36, 338-40).) Although the ratings and comments in the individual categories were similar to those in years past, Duke had recently instituted an automatic rating system that did not allow for manual manager discretion as before. (JA-217 (citing JA-341-43, 1004-06).) Consequently, Rozzelle had no discretion in Baldwin's 2009 APA overall "Partially Meets" rating score. (JA-217 (citing JA-1004-06).) Rozzelle finalized Baldwin's APA on or about January 7, 2010, and she provided it to Baldwin on January 15, 2010. (JA-

217 (citing JA-1006-07, 1088-94).)

> ### a. Baldwin Rebuts His 2009-2010 APA But Does Not Claim Perceived Discrimination Or Retaliation.

Baldwin provided Rozzelle with a written rebuttal to his APA on January 18, 2010.  (JA-217-18 (citing JA-532-87, 363-64).)  Baldwin's rebuttal did not allege discrimination or retaliation.   Instead, Baldwin principally disputed the APA's characterization of his performance.  (*See id.*; *see also* JA-1007-08, 828.)  Rozzelle and her supervisor, David Johnston, examined the grounds for Baldwin's rebuttal. (JA-218 (citing JA-1008-13).)  Ultimately, Rozzelle and Johnston agreed to revise slightly Baldwin's APA in two areas, though neither resulted in increasing Baldwin's overall APA rating.   (*Id.*; *see also* JA-816-18, 437-39, 520-28.) Regardless, there is no evidence that the APA detrimentally altered the terms or conditions of Baldwin's employment; Baldwin even admitted it did not lead to a demotion, loss in job responsibilities, or his discharge.  (*See* JA-233 (citing JA-354-55).)

> ## B. Baldwin's FMLA Leaves Of Absence Begin Long After His Performance Problems Began And Ended Long Before He Is Discharged.

> ### 1. <u>Baldwin's November 2009 Leave Of Absence Was For A "Minor" Outpatient Procedure, And Baldwin Admitted He Does Not Believe Anything Actionable Occurred Because Of It.</u>

In the meantime, Baldwin began an FMLA-covered leave of absence in November 2009.  (JA-216 (citing JA-592-95).)  When informing Rozzelle of his

need for leave, Baldwin referred to having a "minor" outpatient procedure and invited Rozzelle to ask questions. (JA-216 (citing JA-1000).) Baldwin initially told Rozzelle that he expected to be released to resume working, albeit from home, in early November 2009. (*Id.*) Despite being instructed to do so, Baldwin did not properly keep Duke apprised of his expected return-to-work status. (JA-216 (citing JA-392, 1000-03).) Baldwin's physician released him to return to work on or about December 11, 2009, at which point Baldwin took two weeks of vacation and then worked from home until approximately January 14, 2010 (his physician had requested he do so until January 11, 2010).[6] (JA-216 (citing JA-592-97, 388-92, 1001-03).)

### 2.   Baldwin Told Duke That His Second Leave Of Absence On January 19, 2010 Was For A Non-Cancer Abdominal Surgery, And Duke Subsequently Allowed Him To Work From Home Due To A Temporary, Unspecified Restriction.

After Rozzelle finalized Baldwin's APA but before she issued it to him, on January 8, 2010, Baldwin informed her he needed to take a second leave of absence beginning January 19, 2010. (JA-218 (citing JA-598-99, 1006-07, 601-02).) Baldwin initially suggested to Rozzelle that he might have cancer, but then

---

[6] Rozzelle initially inadvertently overlooked an email regarding his returning to work. (JA-1003.) However, Rozzelle signed the appropriate paperwork before Baldwin's physician allowed him to return to the office to work, thereby not delaying Baldwin's return to work. (*Id.*) Regardless, Baldwin admitted during his deposition he does not believe Duke did anything discriminatory regarding his first leave of absence. (JA-216 (citing JA-351, 385-87).)

clarified he was actually having abdominal surgery related to his previous surgery and that it was not due to cancer. (JA-1006-07.) Based on the information Baldwin provided Rozzelle, she did not consider him disabled and expected him to return to work with no lasting restrictions. (*Id.*; *see also* JA-352-53.)

During the week of March 15, 2010, Baldwin informed Rozzelle that he likely would be released to return to work the following week and likely would be back in the office on March 22, 2010.[7] (JA-219 (citing JA-1014).) As of March 22, 2010, Rozzelle had not heard from Baldwin, and he was not in the office as expected. (*Id.*) Baldwin's failure to follow directions regarding how to submit the return-to-work paperwork led to confusion regarding his actual return-to-work date.[8] (*See* JA-219 (citing JA-385, 1013-14, 1102-03); *see also* JA-1014-15, 604, 893, 935-37.) In Baldwin's return-to-work paperwork, Baldwin's physician requested that he be allowed to work from home until April 30, 2010 for an unspecified reason. (JA-219 (citing JA-603-04).)

Although Duke had previously revoked Baldwin's permission to work from home in mid-May 2009, it allowed him to do so temporarily in 2010 pending

---

[7] Baldwin exhausted his 12-week allotment of FMLA leave on March 3, 2010. (JA-887.)

[8] During this time period, Rozzelle actively tried to assist Baldwin with resuming work. ((JA-220 (citing JA-1013-17, 1104-05).)

receipt of additional information from his physician following his FMLA leave.[9] (JA-219 (citing JA-1015-16).) However, because of Baldwin's prior issues working from home and the performance issues that existed prior to his FMLA leave, Rozzelle and Johnston instructed Baldwin to touch base with them daily regarding work progress and availability. (JA-220 (citing JA-694-96, 1017-18, 1058-59).)

Baldwin's first work-from-home note expired on April 30, though additional temporary work-at-home requests followed (which Duke initially granted) – first to May 5, 2010, and then to June 24, 2010. (JA-221 (citing JA-605-06, 609-10, 396-98).) The text of the physician's notes clarified this work-at-home "restriction" was due to Baldwin's temporary need to sit for less than 30 minutes at a time. (*See id.*; *see also* JA-396-98.) In response and in accordance with Duke's procedures, Johnston asked Baldwin to provide a picture of any type of furniture he might need to enable him to work in the office and to consent to his physician speaking with Duke's medical officer to determine what, if anything, Duke could do to enable him to work in the office rather than at home. (JA-221 (citing JA-611-17, 825, 396-400); *see also* JA-221 (citing JA-828-29, 867, 948-49).) Despite repeated

---

[9] It now seems clear that Baldwin's alleged medical need to work from home was not due to the second surgery. Instead, the documents submitted under seal support that an unrelated post-FMLA injury served as the basis for this purported need which clearly has nothing to do with the FMLA leaves or any alleged disability. (JA-1783-95.)

requests, Duke never received additional information beyond that stated on the earlier note.[10] (JA-221-22 (citing JA-603-10).)

### C. Duke Assists With Baldwin's Temporary Medical Restriction, But He Refuses To Return To The Office To Work And Is Discharged Accordingly.

Approximately four months after his FMLA leave expired, Baldwin sought a further extension of time to work from home through August 19, 2010. (JA-222 (citing JA-608).) For several reasons, Duke decided it would not grant Baldwin's continued request to work from home.[11] (*See* JA-222 (citing JA-749-50, 742-46, 864, 942, 946, 825).) First, Baldwin's performance deficiencies had continued, and it was apparent that greater supervision of his work was necessary. (*Id.*) Importantly, these were the same concerns that led to the revocation of Baldwin's Work @ Home participation in early May 2009 – prior to the onset of any complained-of actions in this lawsuit. (*See* JA-213 (citing JA-773-75, 785-86, 986-87, 693, 1031-36).)

---

[10] Duke's frustration with Baldwin's lack of cooperation was echoed by a Human Resources representative, Milt Martin, encouraging Johnston to "keep the heat on" Baldwin to provide the requested information. (JA-846-49.)

[11] In June 2010, because Baldwin was not sufficiently responding to Rozzelle's management oversight, the decision was made to have Baldwin start reporting to Johnston, which he did that month. (JA-944-45 ¶18; *see also* JA-1413, 1473.) Thus, this decision not to allow Baldwin to work from home was not made by Rozzelle.

Second, Baldwin's temporary,[12] minimal "restriction" that purportedly necessitated his working from home was the same as before and still temporary; there was no new restriction purportedly necessitating him to work from home. (*Compare* JA-605-06, 609-10 *with* JA-607-08.)[13]    As a result, Johnston,[14] Robinson and Human Resources determined that Duke could assist Baldwin's working in the office within his temporary, stated restriction by ensuring he sit for less than 30 minutes at a time.  (JA-222-23 (citing JA-743-33, 946, 969-70); JA-864, 942, 825, 745-46.)  Doing so was wholly in accordance with Duke protocols. (JA-943, 742-43.)

Director of Employee Relations Debbie Patton spoke with Baldwin on August 2, 2010, and told him that Duke would provide assistance ensuring he could work in the office without sitting for longer than 30 minutes.  (JA-223 (citing JA-721-25, 865, 400-02).)  Patton also told Baldwin that Duke expected him to return to the office on August 4, 2010.  (*See id*.)  Baldwin informed Patton he

---

[12] No one considered Baldwin's "medical needs," if actually any, as anything more than a temporary condition, including Vice President of Generation IT Carl Robinson – the decision-maker as to Baldwin's termination.  (JA-222 (citing JA-948-49).)

[13] While Baldwin's "restriction" of needing to sit for long periods of time purportedly necessitated his working from home, he nevertheless came into the office for meetings, traveled to nuclear facilities over 30 minutes away from his home and met co-workers out for lunch, casting doubt on the medical necessity for the work-from-home restriction.  (*See* JA-222 (citing JA-890, 948-49).)

[14] By this time Johnston, not Rozzelle, had direct supervisory responsibility over Baldwin.  (JA-1027.)

would defer to his attorney and Duke's in-house counsel on next steps. (JA-223 (citing JA-621-23).) Patton responded to Baldwin that he was "still expected to report to the . . . office" as instructed. (*See id; see also* JA-865-66.)

Baldwin ignored these repeated instructions and did not go to the office on August 4, 2010. (JA-223 (citing JA-402-08, 621-23, 709, 748-49).) Although Baldwin missed the deadline, Duke gave Baldwin yet another chance to comply. On August 6, 2010, per Baldwin's request, Duke's in-house counsel informed Baldwin's then-attorney (and first of four), Margaret Maloney, of the Company's expectation that Baldwin report to the office and that he no longer continue working from home.[15] (JA-223 (citing JA-705-06, 708-11).) Baldwin unequivocally testified that his attorney never shared the in-house counsel's expectation with him before his termination and that, if she had, **he would have reported to the office**. (JA-223-24 (citing JA-412, 399); *see also* JA-1769.) However, Maloney **did** share this information with Baldwin that same day via an e-mail that Baldwin undisputedly received and, as shown on the email chain, responded to. (JA-224 (citing JA-708-11, 705-06).)

---

[15] Maloney and Duke's in-house counsel were also discussing Baldwin's Recourse concerning Rozzelle's alleged religious discrimination, as discussed below, at this same time. (JA-710-11.) However, Duke's in-house counsel made clear that Baldwin was nevertheless expected to return to work. (JA-705-06, 708-11.) Baldwin has not provided any evidence that this was contrary to Duke's protocol.

Despite receiving an express instruction three times to report to the office to work, including on one occasion from Duke's in-house counsel, Baldwin elected to ignore these instructions.[16]  (JA-224 (citing JA-404-08, 708-11).)  Consequently, Robinson decided, in consultation with HR, that Baldwin's insubordination was the proverbial last straw and his actions warranted termination.  (JA-224 (citing JA-748-49, 947).)[17]

Baldwin was discharged on August 16, 2010.  (*Id.*)  This occurred approximately five months after his FMLA leave ended, almost a year after Duke first had notice that Baldwin had any alleged medical issues, more than a year after Rozzelle allegedly learned he is purportedly Jewish and approximately three months after Baldwin complained of perceived discrimination, as set forth below.

### D. Duke's Investigation Of Baldwin's May 13, 2010 Complaint Of Religious Discrimination Did Not Corroborate His Concerns.

Shortly after Duke first asked Baldwin to clarify his "medical restriction," on May 13, 2010, Baldwin utilized Duke's internal Recourse Process to dispute his APA and to challenge his alleged mistreatment by Rozzelle.[18]  (JA-224-225 (citing

---

[16] Duke does not dispute that Baldwin continued to work remotely during this time, but, as stated above, it required and instructed him to work **in the office**. (*Compare* Baldwin Opening Br. p. 10 *with* JA-744, 943.)

[17] Rozzelle played no role in the decision-making process nor was she consulted regarding the same.  (JA-222 (citing JA-1027).)

[18] Unsupported by even a shred of record evidence, Baldwin now incorrectly alleges that he filed a complaint with Duke's then-Chief Legal Officer, Mark E. Manly, in June 2010.  (Baldwin's Opening Br. p. 9.)  Instead, Baldwin has only

JA-415, 624-30).)  For the first time, Baldwin claimed he believed Rozzelle gave him the 2009-2010 APA rating because he is (allegedly) Jewish – but not because he took FMLA leaves or that she or anyone else at Duke perceived him as disabled.  (*Id.*)

The crux of Baldwin's internal complaint against Rozzelle is his conjecture that Rozzelle learned he is Jewish at the May 29, 2009 volunteer Legal Aid event previously described.  (*Id.*)  In this, Baldwin ignores that Rozzelle documented concerns with his performance and revoked his Work @ Home participation *before* that event.  (*See* Section II(A), *supra*.)  What is more, Duke's Human Resources Department thoroughly investigated Baldwin's claims and found nothing to substantiate that Rozzelle – or anyone – harbored a bias against Baldwin.[19]  (JA-225-26 (citing JA-884-937, 943-45, 751-52, 841-43, 634).)  As part of his Recourse, Baldwin also claimed his APA rating was improper – a claim Duke also

---

ever claimed that Manly instructed him that, since Baldwin was represented by counsel, Duke's in-house counsel and his counsel would communicate regarding his Recourse. (JA-54, 76, 402-06.)  Regardless, Baldwin has not alleged that anyone at Duke instructed him that he could work from home pending these discussions.

[19] This exhaustive investigation included Human Resources representatives reviewing pertinent documents, requesting additional information from various sources, and interviewing Baldwin, Rozzelle, Baldwin's co-workers and an additional witness who Baldwin identified during the course of the investigation. (JA-225-26 (citing JA-886-93, 848, 968-69).)

investigated and found to be without any support.[20]  (JA-225 (citing JA-943-44, 752).)

### E.    The Bulk Of Baldwin's "Evidence" Comprises Inadmissible And Unsupported Allegations.

The facts set forth above are supported by the record evidence.  Baldwin, however, advances numerous unsupported allegations to support his appeal, which is made obvious by his failure to cite to the joint appendix.  The following *allegations* either have no record support (aside from Baldwin's speculation) or were refuted by admissible evidence:

| Baldwin's Allegation | Where/How Refuted |
|---|---|
| Baldwin was declined a transfer as a result of his FMLA leave.  (Baldwin Opening Br. pp. 8, 16 n. 1.) | There was never an open position into which Baldwin could transfer, and transfer discussions occurred before he provided notice of his need for FMLA leave.  (JA-215 (citing JA-269, 273-75, 357-61, 445-47, 756, 778-79, 998-1000, 1020-21, 1125-27).) |
| A former co-worker of Baldwin, Diana Williamson, told Baldwin that someone heard Rozzelle state, "Plaintiff's FMLA leaves were a scam between [Baldwin] and his Jewish doctors and that they all (Jews) all [sic] stick together." | Baldwin claimed during discovery that Williamson had told him that Rozzelle had made these statements.  Under Oath, Williamson denied this, swore that she never heard such a rumor, and swore that she never informed Baldwin of the same.[21]  (JA-233 (citing JA-344-45, |

---

[20] This investigation, which was conducted separately from the Human Resources investigation referenced above, was conducted by Carl Robinson.  (JA-225-26.) Robinson requested and reviewed detailed information from Johnston regarding Baldwin's performance.  (*Id.*)

[21] In fact, the very pages to which Baldwin cites in his Opening Brief disprove his very allegation.  (*See* JA-233, 344.)

| | |
|---|---|
| (Baldwin Opening Br. p. 8.) | 383-85, 347-48, 435-36, 481, 828, 1147).) |
| Rozzelle "told [Baldwin's] peers that he was having a sex change operation." (Baldwin Opening Br. pp. 7-8.) | Baldwin claimed during discovery that Williamson had told him that Rozzelle had made these statements. Williamson denied this under oath. Baldwin and another witness admitted that Rozzelle did not make this comment. (JA-237 (citing JA-393-94, 379-82, 433-34, 714, 1142-49).) |
| Rozzelle shut down Baldwin's Log-In and User ID. (Baldwin Opening Br. p. 8.) | No record support aside from his own baseless allegation. |
| Rozzelle accused Baldwin of stealing equipment, told his peers about his performance problems and called him "sneaky." (Baldwin Opening Br. pp. 7-8.) | Baldwin claimed during discovery that Williamson had told him that Rozzelle had made these statements. Williamson denied this under oath. (JA-1145-46.) |
| Rozzelle asked for "carte blanche" to Baldwin's medical records. (Baldwin Opening Br. p. 8.) | No record support aside from his own baseless allegation. |
| Rozzelle cleared out his cubicle following his leave of absence. (Baldwin Opening Br. p. 8.) | No record support aside from his own baseless allegation. |
| "Further, there were several comments attributed to [Duke's] management that displayed a negative animus toward the Jewish faith." (Baldwin Opening Br. p. 27.) | No record support. (*See also* JA-232-33, 344-45, 347-48, 383-85, 435-36, 481, 828, 1025, 1142-49.) |

## III.  SUMMARY OF ARGUMENT

Even viewing the record evidence in a light most favorable to Baldwin, the

District Court properly granted Duke's motion for summary judgment. (JA- 1721-

39.)  Notably, Baldwin confided in a post-termination conversation with a former co-worker that he was essentially "grasping at straws" in trying to come up with a reason for his discharge.  (JA-1458.)[22]  Now desperate, Baldwin does far more than "grasp at straws" in his Opening Brief.  Although it presents a colorful story, it is woefully misleading.  Baldwin purposely intermixes alleged events with various allegations while often completely ignoring the relevance of when such events occurred or who was involved – key and relevant factors in analyzing discrimination and retaliation cases.  The notable absence of record citations to support many of his conclusory statements is telling.

Importantly, Baldwin admitted at oral argument before the District Court that the only actionable adverse action is his discharge.  (JA-1768-69.)  But his Opening Brief inappropriately ignores this admission by attempting to resurrect issues regarding his performance, his 2010 APA, and various allegations that he was subjected to "scrutiny."  A party who makes concessions before the District Court cannot later attempt to retract them.  *See*, *e.g.*, *Edmondson v. Am. Motorcycle Ass'n, Inc.*, 7 F. App'x 136, 144 n.6 (4th Cir. 2001).  Further, the record evidence supports the undisputed conclusion that Duke discharged Baldwin after he refused on three separate occasions the Company's directive to return to

---

[22]  At the time, all that Baldwin could even muster was a "belief" that he was discharged because of his alleged religion.  (JA-1458.)  His additional claims for ADA and FMLA were not even "possibilities."  (*Id.*)

the office to work.  Therefore, even if Baldwin's performance, APA, and alleged "scrutiny" are at issue, they do not constitute adverse employment actions from which liability can arise against Duke, nor do they create *material* questions of fact to preclude summary judgment.

As to Baldwin's FMLA retaliation claim,[23] the District Court properly applied the "but for" causation standard in light of the Supreme Court's ruling in *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2534 (2013).  Regardless, even under a "motivating factor" standard, the record evidence supports the District Court's conclusion that Baldwin's discharge was legitimate and had nothing to do with his FMLA leaves.

Regarding Baldwin's ADA claim, it is premised solely on perceived disability discrimination.  Baldwin has never claimed that he was a qualified person with a disability.  Nor did his initial and Amended Complaints contain a failure-to-accommodate claim.  There can be no error on claims that have not been

---

[23] Baldwin has all but abandoned his claim for retaliation under Title VII. Although his first stated Issue relates to the "but for" standard of causation under the FMLA and Title VII, he makes no mention of his Title VII retaliation claim in the body of his Opening Brief.  As a result, he has waived this claim. *Canady v. Crestar Mortg. Corp.*, 109 F.3d 969, 973 (4th Cir. 1997) (holding that issues raised in notice of appeal but not briefed on appeal are waived) (citations omitted). Regardless, Baldwin ignores the unequivocal precedent set by the Supreme Court in *Nassar* that "but for" causation applies to Title VII retaliation claims.  *Univ. Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).  For the reasons that Baldwin is unable to establish causation for his FMLA claim, so, too, can he not do so on his Title VII retaliation claim.  (*See* JA-242-44.)

advanced before the trial court, and Baldwin cannot introduce an entirely new cause of action now. Further, the record evidence reveals that none of the decision-makers regarded Baldwin as disabled. Instead, their only opinion about Baldwin's medical condition was that it was temporary and minor, if anything. Baldwin's mere speculation to the contrary is not *evidence*.

Finally, the record demonstrates that Baldwin has adduced no evidence that his alleged religion – whether known or unknown – played any role in his discharge. The only supervisor who is accused (on the thinnest evidence) of harboring anti-Semitic views, Rozzelle, played no role in the discharge decision, and Baldwin's termination was not based upon information or assessment received from Rozzelle.

Baldwin's Opening Brief recycles his old efforts and relies on a recitation of his *allegations* and not actual record evidence. Affirmation of summary judgment is appropriate.

## IV.    ARGUMENT

### A.    Standard Of Review

This Court reviews the District Court's summary judgment ruling *de novo*. *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 149 (4th Cir. 2012) (citing *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011)). Moreover, it can affirm summary judgment "on any ground that appears from the record, whether or not the trial

court relied on it." *Maynard v. Gen'l Elec. Co.*, 486 F.2d 538, 539-540 (4th Cir. 1973) (citation omitted). Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party must prove that summary judgment is appropriate, and upon making that showing, the non-moving party must respond to the motion with "specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id*. at 247-248. The nonmoving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hospital Corp. of Am.,* 977 F.2d 872, 874-875 (4th Cir. 1992).

In ruling on a motion for summary judgment, the court must view the facts and inferences to be drawn from the evidence – not the allegations – in the light most favorable to the non-moving party. *See Shealy v. Winston,* 929 F.2d 1009, 1011 (4th Cir. 1991). Under *Reeves v. Sanderson Plumbing Prods., Inc.*, Baldwin is required to establish a *prima facie* case at a minimum, including by way of

producing his own evidence. 530 U.S. 133, 148 (2000). He has not done so here. Additionally, in his Opening Brief, Baldwin cites *Ballinger v. N.C. Agric. Extension Serv.* and its progeny for the premise that summary judgment in employment discrimination cases is inappropriate because "state of mind and motive are often critical determinations[.]" 815 F.2d 1001, 1004-05 (4th Cir. 1987) (citations omitted). (Baldwin's Opening Br. p. 13.) However, the Fourth Circuit in *Ballinger* clarified that "the fact that motive is often the critical issue in employment discrimination cases does not mean that summary judgment is *never* an appropriate vehicle for resolution." *Id.* (quoting *Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1272 (4th Cir. 1981) (emphasis in original)). In this, the *Ballinger* court noted that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. 242 (emphasis in original)); *see De Leon v. St. Joseph Hosp., Inc.*, 871 F.2d 1229, 1233 n.7 (4th Cir. 1989).

**B.    The District Court Properly Granted Summary Judgment In Favor Of Duke.**

**1.    The Only Actionable Adverse Action At Issue Is Baldwin's Termination.**

As a threshold matter, Baldwin cannot reverse course after his counsel's admissions to the District Court during oral argument that Baldwin's termination is the only actionable adverse employment action here.  (*See* JA-1768-69.)

This Court has held that when a party makes concessions or admissions before a District Court, it cannot later attempt to revoke that concession or admission.  *See, e.g.*, *Edmondson v. Am. Motorcycle Ass'n, Inc.*, 7 F. App'x 136, 144 n.6, 2001 U.S. App. LEXIS 1506 (4th Cir. 2001) (holding the defendant waived its argument on appeal that that Ohio law was different and should govern the matter because it had conceded before the district court that North Carolina law applied to all causes of action and during the charge conference the defendant had conceded that Ohio and North Carolina law were identical); *see also United States v. Taylor*, 659 F.3d 339, 348 (4th Cir. 2011) ("[T]he defendant is deemed bound by the acts of his lawyer-agent.") (internal quotation marks omitted), *cert. denied*, 132 S. Ct. 1817, 182 L. Ed. 2d 634 (2012); *United States v. Jones*, 496 F. App'x 312, 314 (4th Cir. 2012) (holding that defense counsel's concessions at lower court that defendant qualified as an armed career criminal resulted in waiver of his right to challenge the same on appeal).  Yet, that is precisely what Baldwin does in his

Opening Brief by expanding the discussion far beyond the termination issue. The arguments made during the summary judgment proceedings before the District Court judge are instructive:

> [DUKE'S COUNSEL]: [T]here is really just that single, single adverse employment action and that's the termination. And for that reason we believe we're entitled to summary judgment.
>
> THE COURT:          Thank you very much.
>
> [BALDWIN'S THEN-COUNSEL]: This does come down to the termination and what is at dispute here is the refusal to come to work.

(JA-1768-69.) Baldwin cannot change course now and resurrect claims his own attorney explicitly admitted were not viable.

In fact, Baldwin has adduced no evidence to demonstrate that Duke ever used his 2009-2010 APA rating to alter the terms or conditions of his employment. (*See* JA-233 (citing JA-354-55).) Under such circumstances, it is well-established in this Circuit that the APA does not constitute an adverse employment action. *See, e.g.*, *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 332 (4th Cir. 2012).

Nor are there other facts – or even case law – to support the existence of legally actionable "scrutiny." (*See* JA-236-38, 245.) *See, e.g.*, *Wells v. Gates*, 336 F. App'x 378, 381 (4th Cir. 2009) (employer's refusal to lift work-related restrictions was not objectively hostile and abusive for retaliation claim in light of legitimate grounds for said restrictions and plaintiff's continued deficiencies

necessitating same); *Lee v. State Bd. for Community Colls.*, 1995 U.S. App. LEXIS 20658 (4th Cir. Aug. 4, 1995) (no retaliation adverse action based on harassment due to employer's restricting plaintiff's personal phone use, harassing plaintiff over leave time, criticizing her work in the presence of other employees, scrutinizing her work, and giving her unwarranted poor work evaluations).

Not to be deterred, Baldwin continues to describe in generic terms that he was "harassed" without providing admissible evidence regarding such "harassment," or even attempting to apply the standard for actionable harassment to his facts.[24]  (*See*, *e.g.*, Baldwin Opening Br. pp. 16-17.)  This does not preclude entry of summary judgment.

> ### 2.     There Is No Evidence To Support The Contention That Baldwin's FMLA Leave Resulted In His Termination.
>
> #### a.     The District Court Correctly Applied A "But For" Standard To Baldwin's FMLA Retaliation Claim.

Recent Supreme Court precedent clarified that, in order to advance a viable claim for retaliation, the plaintiff must establish that the adverse action at issue would not have occurred **but for** his exercising his statutory rights.  *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).  Although the

---

[24] Baldwin did not set forth an independent claim of harassment.  Instead, he identified trivialities consisting of work criticism, close monitoring, lost belongings, and other neutral work-related issues which do not constitute adverse employment actions, including actionable harassment, and are completely unrelated to his termination.  (*See* JA-236-38, 245.)

Supreme Court in *Nassar* addressed Title VII's retaliation framework, the Court's rationale for the "but for" standard applies with equal force to FMLA retaliation claims.

First, the Court noted that, "[c]ausation in fact … is a standard requirement of any tort" or "federal statutory claims of workplace discrimination," and causation in fact "[i]n the usual course" means "but for" causation. *Nassar*, 133 S. Ct. at 2524-25 (citations omitted). Therefore, "absent an indication to the contrary in the statute itself," Congress "is presumed to have incorporated" the "but for" default standard into Title VII. *Id.* at 2525.

Like Title VII, the FMLA contains no language indicating that retaliation claims should be analyzed under any particular standard. The FMLA on its face does not even authorize retaliation claims. Given the absence of any statutory indication within the Act regarding the appropriate standard, *Nassar* commands that the "presumed," "default" standard of "but for" causation must apply to FMLA claims. Such a determination is also consistent with this Circuit's prior decisions expressly holding that "FMLA retaliation claims are analogous to discrimination claims brought under Title VII." *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (citing *Yashenko v. Harrah's N.C. Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006)).

Second, the *Nassar* Court relied in part on Congress's 1991 decision to amend the discrimination section of Title VII, 42 U.S.C. § 2000e-2(a), but not the retaliation section, 42 U.S.C. § 2000e-3(a).  This amendment included imposing a "lessened causation standard" that required a plaintiff to prove only that the protected characteristic was "a motivating factor" in the adverse employment action.  *Nassar*, 133 S. Ct. at 2526 (citation omitted).  The *Nassar* Court found it significant that Congress chose *not* to change the anti-retaliation section of Title VII.  *Id.* at 2528.  Similarly, the FMLA was enacted in 1993 – two years *after* Congress amended the discrimination section of Title VII.  Congress could have drafted the FMLA to require a "motivating factor" causation standard (or some other lower causation standard) but it chose not to do so.  "When Congress amends one statutory provision but not another, it is presumed to have acted intentionally."[25]  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009). Application of the "but for" standard in the FMLA retaliation context plainly squares with Congressional intent and binding precedent.[26]

---

[25] That the Department of Labor adopted a "negative factor" standard to FMLA retaliation claims in its interpretive regulations does not change the analysis.  29 C.F.R. § 825.220(c).  The Court in *Nassar* dealt with similar limiting interpretive language from the EEOC and afforded it no deference in its holding.

[26] Even if this Court holds otherwise, Baldwin  nonetheless cannot assert an FMLA retaliation claim under the "motivating factor" standard.  *See*, *e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (superseded by 42 U.S.C. § 2000e-2(m)) (recognizing mixed-motive cause

The *Nassar* opinion does nothing to create new grounds to distinguish Title VII from the FMLA. In light of the longstanding treatment of FMLA and Title VII retaliation claims as synonymous within this Circuit and the critical similarities derived from *Nassar*, this same treatment should continue. Accordingly, the District Court did not err when it applied the "but for" standard to Baldwin's FMLA retaliation claim.

> **b.  Baldwin Advanced No Evidence To Support His Claim That Duke Retaliated Against Him Because Of His FMLA Leaves.**

The record evidence fully supports the District Court's holding that Baldwin cannot establish his *prima facie* case of FMLA retaliation. Nor can he overcome Duke's proffered, legitimate reason for his termination. The District Court correctly granted summary judgment as to this claim.

> **(i)  No Causal Connection Exists Between Baldwin's FMLA Leaves And Termination.**

Baldwin cannot establish a required element of his *prima facie* case for retaliation: that his FMLA leaves were causally connected to his discharge.

First, in his Opening Brief, Baldwin blends the chronology and characterizes his FMLA leaves as "parallel" to alleged improper acts in an attempt to establish a causal connection by way of temporal proximity. (Baldwin Opening Br. pp. 14-

---

of action under Title VII); *see also Averette v. Diasorin, Inc.*, No. 3:11CV203, 2011 U.S. Dist. LEXIS 93761, (W.D.N.C. Aug. 22, 2011) (noting the lack of Fourth Circuit precedent).

19.)  Temporal proximity is not in play here.[27]  Over five months passed between Baldwin's last FMLA leave expiring and his discharge; such a period is unequivocally insufficient to establish temporal proximity.[28]  *See King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (period of two months and two weeks between protected activity and adverse action was sufficiently long to weaken significantly the inference of causation between the two events).   Even the purported temporal proximity between Baldwin's first FMLA leave and his claim of undue "scrutiny" fails to establish a causal connection.   By Baldwin's own allegations, Rozzelle began the alleged "scrutiny" long *before* he requested his first FMLA leave.  (*See*, *e.g.*, JA-41-42, 270, 320-21, 442-43.)  *See Smith v. Ashland, Inc.*, 250 F.3d 1167, 1174 (8th Cir. 2001) (employee whose history of inadequate work performance predated her protected activity could not establish the protected activity was causally related to her termination).   Further, the record evidence supports the conclusion that the concerns noted in Baldwin's 2009-2010 APA arose from incidents that occurred **before** Baldwin requested an FMLA leave.  (*See*, *e.g.*, JA-981-1000.)   In this light, there is no evidence to support a causal

---

[27] Nor is temporal proximity sufficient.  *Mercer v. Arc of Prince Georges County, Inc.*, 532 F. App'x 392, 397 (4th Cir. 2013) ("While timing is a relevant factor, it will rarely be independently sufficient to create a triable issue of fact.")

[28] Contrary to Baldwin's claim in his Opening Brief, he did not complain about FMLA retaliation during his Recourse.  (Baldwin Opening Br. p. 17.)  That Baldwin did not cite to the record evidence to support this – or most other allegations in his Opening Brief – solidifies this position.

connection between Baldwin's FMLA leaves, or Rozzelle's criticism of his performance, and his ultimate termination for repeated insubordination.

Second, the District Court correctly determined that, to the extent Baldwin complained of alleged "scrutiny" and a "less than positive" 2009-2010 APA rating, he could not establish a causal connection between those events and his FMLA leaves because his performance issues predated his FMLA leave.   (JA-1736.) Attempting to deflect the undeniable fact that Baldwin's performance issues predated his first FMLA leave, Baldwin relies on his self-serving opinion characterizing these preexisting performance problems as "minor," and thereby arguing that the District Court gave them undue weight in ruling on his FMLA retaliation claim.  (Baldwin Opening Br. p. 19.)  Baldwin's argument is contrary to well-established precedent in this Circuit that a plaintiff's perception of his job performance is irrelevant.  *See Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980) (it is solely the perception of the decision-maker that matters, the plaintiff's "perception of himself . . . is not relevant"); *see also Mercer*, 532 F. App'x 392, 399 (4th Cir. 2013) (holding that plaintiff's subjective view of her job performance is not sufficient to survive summary judgment in FMLA retaliation claim).

As his supervisor, Rozzelle counseled Baldwin on his performance deficiencies, and this intervention commenced well before his first FMLA leave. (*See*, *e.g.*, JA-981-1000.)  Similarly, Johnston continued the same course of action

once he began directly supervising Baldwin. (JA-819-823, 741.) That Baldwin's supervisors before Rozzelle and Johnston expressed similar concerns about his performance further undercuts Baldwin's view that he was performing satisfactorily. (*See* Section II(A)(1), *supra*.) *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 61-62 (4th Cir. 1995) (affirming summary judgment for employer because substantial evidence of unsatisfactory performance prevented plaintiff employee from establishing satisfactory performance).

> (ii) **Baldwin Advanced No Evidence Of Pretext To Overcome Duke's Proffered Legitimate Reason For His Discharge.**

Baldwin also presented no evidence to refute Duke's legitimate basis for terminating his employment, which was due to his repeated refusal to comply with a Company-issued directive.[29] Instead, he wants to revise his past defenses to insubordination, insisting now that he was merely following an instruction *not* to return to the office. Baldwin also now contends that Duke should have accommodated him by allowing him to work from home despite the fact that Duke could comply with his physician's restrictions at the office.[30] (Baldwin Opening

---

[29] As set forth above, Baldwin's "evidence of a negative animus" is untrue. (*See* Section II(E), *supra*.)

[30] Not only are these new claims of no import, but they are also disingenuous. During the summary judgment hearing at the District Court, Baldwin's then- (and third) counsel echoed Baldwin's earlier deposition testimony and repeatedly placed the blame on his attorney for not having conveyed Duke's in-house counsel's message to him that he was expected to return to the office. (JA-1769.)

Br. pp. 22-23.)  Moreover, Baldwin never presented evidence of any purported comparators, or any other evidence that could establish pretext.

First, there is no evidence that Baldwin was following any direction to continue working at home.  To the contrary, the record evidence plainly establishes that Duke's repeated instruction to Baldwin to return to the office could not have been made more clearly.  (*See* Section II(C), *supra*.)  Even after Baldwin wrote that he would defer to his counsel's and Duke's in-house counsel's instructions, Patton countermanded Baldwin's self-serving option and reiterated that Duke's expectation remained that he return to work.  (JA-400-02, 721-25, 865.)  When Baldwin defied Patton's direction, Duke's in-house counsel expressly informed Baldwin's then-lawyer (Maloney) that Duke expected Baldwin to return to the office.  (JA-705-06, 708-11.)  Maloney then conveyed this message to Baldwin; she never instructed him not to return to the office to work.  (*See id*.)  These actions squared with Duke's protocol, (JA-943, 742-43), and Baldwin has not presented evidence to the contrary.  Baldwin's subjective rationale for not

---

Additionally, and as stated above, Baldwin does not have – and has never had – a failure to accommodate claim present in this lawsuit.  Even if he did, Duke proffered him an accommodation, and it was not his right to insist upon the accommodation of his choice (i.e., work from home).  *See*, *e.g.*, *Hollestelle v. Metropolitan Wash. Airports Auth.*, 1998 U.S. App. LEXIS 9420, at *12 n.5 (4th Cir. May 8, 1998); *Corrigan v. Perry*, 1998 U.S. App. LEXIS 5859, at *26 (4th Cir. Mar. 24, 1998) ("the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide") (citing 29 C.F.R. § 1630.9 app.).

returning to the office is not evidence of pretext, nor is it even relevant to that inquiry.[31]  Baldwin's attempt to place the blame on Duke for his own decisions cannot constitute pretext for a retaliation claim.

Second, Baldwin's argument that his FMLA retaliation claim is supported by the fact that Duke should have "engaged in the required ADA interactive process" is illogical.  (*See* Baldwin Opening Br. p. 23.)  If an employee cannot return to work at the end of his FMLA leave, the FMLA no longer guarantees him a right to job restoration.  *See* 29 C.F.R. § 825.216(c).  The *FMLA* does not require employers to undergo reasonable accommodation assessments under the *ADA* or risk retaliation claims.[32]  *Dollar v. Smithway Motor Xpress, Inc.*, 710 F.3d 798, 806-807 (8th Cir. 2013) ("unlike the Americans with Disabilities Act, the FMLA does not impose a duty of reasonable accommodation"); *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 384 (3d Cir. 2002) (in ruling on an FMLA retaliation claim, holding that the FMLA does not require "an employer to provide a reasonable

---

[31] For example, even if Baldwin believed that he did not have to return to the office to work because his then-counsel was still discussing his Recourse with Duke's in-house counsel, this is insufficient to establish a retaliatory or discriminatory intent. Employees are expected to stay the course and adhere to their supervisor's instructions even with a pending claim of discrimination.  *See, e.g.*, *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287 (11th Cir. 2007) (employees who file internal complaints do not get to select the remedy of their choice, including not working with the alleged bad actor).

[32] Additionally, as set forth below, Baldwin does not claim to be disabled and, thus, was never entitled to a reasonable accommodation under the ADA.

accommodation to an employee to facilitate his return to the same or equivalent position at the conclusion of his medical leave").

Ultimately, Baldwin had to prove that Duke terminated him because he took FMLA leave; yet he offered nothing to causally connect these two separate events. Significantly, Baldwin failed to provide any evidence of other co-workers who did not take an FMLA leave and ignored an instruction to work in the office but were not terminated. Likewise, Baldwin offered no evidence that other employees with work-at-home "restrictions" were not instructed to return to the office when Duke could accommodate the necessary restrictions in that setting. *See Laing v. Fed. Express Corp.*, 703 F.3d 713, 720 (4th Cir. 2013) (describing the importance of comparator evidence at summary judgment, especially in light of no other evidence of pretext). To the contrary, the record evidence demonstrates that Baldwin was treated consistent with Duke's standard practice of requiring employees to return to work at the office when Duke could meet the limitations in that setting. (JA-943, 742-43.) Baldwin's failure to present any evidence to refute Duke's legitimate reason for his discharge warrants affirmation of the District Court's order granting summary judgment.

### 3. **The District Court Correctly Concluded That There Was No Evidence That Duke Unlawfully Discriminated Against Baldwin Based On A Perceived Disability.**[33]

To support his perceived disability discrimination claim, Baldwin presents two incompatible premises: (1) that Duke wrongly regarded him as disabled when he was not; and (2) that Duke did not accommodate his (non-existent) disability. (Baldwin Opening Br. pp. 24-26.) Either Duke incorrectly regarded Baldwin as disabled (as he had claimed throughout this entire lawsuit) or Duke failed to accommodate an actual disability (which he has never claimed). Baldwin cannot have it both ways. If anything, Baldwin's claim that Duke failed to take his alleged medical condition seriously enough to engage sufficiently in the interactive process supports the conclusion that Duke never considered him disabled. Regardless, neither claim is availing. First, the record evidence supports the point that Duke neither perceived Baldwin as disabled nor discharged him because of the same. Second, Baldwin has never asserted a failure to accommodate claim in this lawsuit. He cannot do so now.

### a. **The District Court Correctly Determined That Duke Did Not Perceive Him As Disabled.**

---

[33] As established above, Baldwin's allegations that Rozzelle removed belongings from his cubicle while he was on a leave of absence, told co-workers he would not be returning to work, and impeded his return to work are not supported by the record evidence and, thus, not admissible to support his claims. (*See*, *e.g.*, JA-1146-47.)

The District Court correctly determined that Baldwin presented no evidence that anyone at Duke regarded him as disabled and, instead, held that there was ample evidence to support a contrary finding. (JA-1721-39; *see also* JA-240-42.)

Circuit Courts, including this Circuit, have routinely held that mere knowledge of a medical condition – even one requiring FMLA leaves – does not constitute a perception of ADA disability. *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (affirming summary judgment on "regarded as" disability claim where employer knew of employee's medical condition "but doubted her declarations pertaining to the severity of her condition"); *see also Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1219 (10th Cir. 2007); *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 507 F.3d 1306, 1315 n.14 (11th Cir. 2007) (plaintiff did not meet her burden to establish she was regarded as disabled even where her employer knew she was being treated for cancer, since she offered no evidence her employer regarded that treatment, or its side effects, as disabling). Instead, the proper focus in perceived disability case is "'on the reactions and perceptions of the employer's decisionmakers.'" *Young v. UPS*, 707 F.3d 437, 444 (4th Cir. 2013) (citations and internal quotations omitted).

Here, the only information available to the decision-makers demonstrated that Baldwin's (unspecified) "medical condition" was temporary and, by Baldwin's own words, "minor." (JA-596-99, 603-10, 780, 1000.) Said differently,

nobody at Duke ever had enough information to form any opinions about Baldwin's alleged medical condition – a fact Baldwin highlights on page 26 of his Opening Brief.  The decision-makers' testimony consistently echoes this position.  At most, they all considered Baldwin's unknown "medical condition" to be temporary and minor.[34]  (JA-489, 744, 828-29, 867, 948-49.)

Even if Robinson (the decision-maker as to Baldwin's discharge) considered Baldwin disabled, there is no evidence that Duke discharged Baldwin because of the same – i.e., he has not established pretext. (*See* JA-241-42, 948, 827-29, 970-71, 867.)  Baldwin's Opening Brief even implies that Duke discharged him without

---

[34] Though Baldwin referenced his history of cancer to Rozzelle on one or two occasions, there is no evidence that the decision-makers believed his cancer was an issue in 2010.  Baldwin even admitted that Rozzelle never indicated to him that she believed he was disabled.  (JA-352-53.)  As such, no disability bias could have existed as to the alleged scrutiny (which began in March 2009) and the APA, eviscerating any causal connection.  (*See id.*)  And, the record evidence is clear that Rozzelle had no involvement in the decision to discharge Baldwin.  (JA-1027.)  Baldwin's claim to the contrary is nothing more than his own speculation that, because he vaguely (and perhaps misleadingly) talked with Rozzelle about having had cancer, Robinson, a nonparty to the conversation, perceived him as disabled. *See*, *e.g.*, *Young v. UPS.* 707 F.3d 437, 444 (4th Cir. 2013) ("[b]ecause [defendant] possessed objective facts suggesting [plaintiff] might have lost the ability to perform central job functions, it had a legitimate reason to seek some verification that [plaintiff] had recovered her ability to perform those duties" and, thus, such inquiry did not serve as evidence that defendant regarded plaintiff as disabled).  Neither Baldwin's conjecture or even a mere scintilla of evidence is sufficient to overturn the District Court's decision.  *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) ("The nonmoving party cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another") (citation and internal quotations omitted); *Am. Arms Int'l v. Herbert*, 563 F.3d 78, 82 (4th Cir. 2009).

considering his medical condition at all – rebutting any connection between the two.  Nor has Baldwin presented evidence of any similarly-situated non-disabled co-workers (perceived or otherwise) who Duke treated better under similar circumstances.  The only evidence in the record on these points supports the conclusion that Duke treated Baldwin in accordance with its protocols.  (JA-943, 742-43.)  Baldwin has not met his burden to tie his allegedly perceived disability to the adverse employment decision of terminating him, and summary judgment was appropriate.

### b.    Baldwin Cannot Assert A Failure To Accommodate Claim Now.

As to Baldwin's newfound failure to accommodate claim, the District Court correctly concluded that Baldwin "does not plausibly contend that he was disabled."  (JA-1732.)  Instead, since the beginning of this lawsuit, Baldwin has only claimed that Duke wrongly perceived him as disabled.[35]  As this Circuit has earlier held, it is far too late for Baldwin to add another claim now.  *Maynard v. Gen'l Elec. Co.*, 486 F.2d 538, 539 (4th Cir. 1973) (prohibiting for consideration "new causes of action raised for the first time on appeal").  Moreover, because an

---

[35] In Baldwin's Amended Complaint, under his "Disability Discrimination and Retaliation Cause of Action," Baldwin expressly – and only – states that Duke violated the ADA "by illegally discriminating against [Baldwin] in the terms and conditions of his employment because [Duke] regarded [Baldwin] as disabled and by retaliating against [Baldwin] because he complained about the discrimination he experienced."  (JA-56.)

employer is not required to accommodate an employee with only a perceived disability, 42 U.S.C.S. § 12201(h), Baldwin's attempted failure to accommodate claim fails.

In any event, Baldwin has adduced no evidence to prove the existence of a disability, and Duke informed Baldwin that it could work within his one stated restriction in the office. (JA-223 (citing JA-721-25, 865, 400-02).) Baldwin's "self-serving opinion [about his restrictions without] . . . objective corroboration does not permit [him] to avoid summary judgment." *Wulff v. Sentara Healthcare, Inc.*, 2013 U.S. App. LEXIS 4446, at *3-4 n.2 (4th Cir. 2013) (quoting *Williams v. Giant Food, Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)); *Pollard v. High's of Balt., Inc.*, 281 F.3d 462, 467 (4th Cir. 2002) (the plaintiff must demonstrate his disability). In fact, documents submitted under seal demonstrate that Baldwin worked from home because of a temporary injury that had nothing to do with either of his surgeries, and which was not a serious, long-term health issue. (JA-1783-95.) This does not fall within the parameters of a temporary disability protected by the ADA. *See, e.g., Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 152 n.10 (4th Cir. 2012) (plaintiff's 15-pound lifting restriction was not severe enough to meet ADAAA's more liberal standard for "disability"). Further, Duke informed Baldwin he could work at the office within his stated restriction, and he made no effort to contest the reasonableness or *bona fides* of that option. (JA-223

(citing JA-721-25, 865, 400-02).)    Baldwin's newly-minted failure to accommodate claim is without merit.

### 4.    Baldwin Has Adduced No Evidence To Support His Claim That Duke Took An Adverse Employment Action Against Him Because Of His Religion.

Baldwin's religious discrimination claim rests entirely on a single event that only one witness – himself – recalled.   Regardless, Baldwin has presented no evidence that his (alleged) Judaism had anything to do with his termination more than one year later.

First, when Baldwin's speculations are stripped away, the record evidence demonstrates that none of Baldwin's managers at Duke knew about his purported Judaism until he filed his Recourse in May 2010 – at the earliest.   (*See* JA-230-32.) At the Legal Aid event in question, Rozzelle never heard a "joke" about Judaism, whether referencing Baldwin or otherwise.   (*See* JA-230 (citing JA-769-72, 991, 1025).)   Rozzelle and Baldwin never discussed Baldwin's religion, and there is no evidence that Rozzelle discussed Baldwin's religion with anyone else.   (JA-230 (citing JA-330-33).)   Baldwin's deposition admissions confirm he cannot dispute this.   (JA-328-33.)   As a result, neither the "scrutiny" (which began before Baldwin

alleges Rozzelle learned he is Jewish) nor the 2009-2010 APA rating can result from religious discrimination.[36] (*See id.*; *see also* Section II(A), *supra*.)

What is more, Baldwin has provided no evidence that Robinson – the decision-maker as to his discharge – held a religious-based bias or the like. Rozzelle is Baldwin's sole alleged "bad actor" here, and the record evidence is clear that she played no role in the termination decision or the events leading to it. (JA-1027.)  Nor has Baldwin adduced any evidence demonstrating that Duke allowed non-Jewish employees to work remotely after being told repeatedly to return to the office.  Instead, the record evidence fully supports the conclusion that Duke treated Baldwin in accordance with its standard practice and protocols.  (JA-943, 742-43.)

## V.    CONCLUSION

For the foregoing reasons, the District Court's judgment should be affirmed.

## VI.   REQUEST FOR ORAL ARGUMENT

Appellees do not believe oral argument is necessary given the clear record supporting the District Court's Order and thus, do not request oral argument at this time.

---

[36] Even if Rozzelle did learn Baldwin is Jewish on May 29, 2009, she had already observed deficiencies in Baldwin's performance and had taken steps to ameliorate the same (i.e., begin "scrutinizing" him).  (JA-943, 842.)

Respectfully submitted,

s/ Stephen D. Dellinger
Stephen D. Dellinger, Esq.
sdellinger@littler.com
Molly M. Shah, Esq.
mmshah@littler.com
LITTLER MENDELSON, P.C.
100 North Tryon Street, Suite 4150
Charlotte, North Carolina 28202
704.972.7000 (telephone)
704.333.4005 (facsimile)

Counsel for Defendants-Appellees

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P.
28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [10,261] words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number
of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using
[*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state
name and version of word processing program*] with [*state number of
characters per inch and name of type style*].


Dated: May 30, 2014                      s/ Stephen D. Dellinger
                                         Counsel for Defendants-Appellees

**CERTIFICATE OF FILING AND SERVICE**

I certify that on this 30th day of May, 2014, I caused this Brief of Appellees

to be filed electronically with the Clerk of the Court using the CM/ECF System,

which will send notice of such filing to the following registered CM/ECF user:

Kenneth Love, Jr., Esq.
Direct: 336-210-1853
Email: kennethl@ldlawnc.com
[COR NTC Retained]
LOVE & DILLENBECK LAW, PLLC
Suite 208
3410 Healy Drive
Winston Salem, NC 27103

Jonathan Wall
Direct: 336-273-1600
Email: jwall@greensborolaw.com
[COR NTC Retained]
HIGGINS BENJAMIN PLLC
Suite 500
Firm: 336-273-1600
101 West Friendly Avenue
Greensboro, NC 27401

s/ Stephen D. Dellinger
Counsel for Defendants-Appellees